**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| PAULA J. ZIMMER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 12-cv-194-TLW ) |
| CAROLYN W. COLVIN,[1] Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

**OPINION AND ORDER**

Plaintiff Paula J. Zimmer seeks judicial review of the decision of the Commissioner of the Social Security Administration, denying her claim for Disability Insurance Benefits (SSDI) under Title II, 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 24). Any appeal of this decision will be directly to the Tenth Circuit.

**INTRODUCTION**

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to

determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 37-year old female, applied for Title II benefits on September 28, 2008, although her application states that she filed on October 21, 2008. (R. 133-34, 144). Plaintiff initially alleged a disability onset date of October 2, 2006, but the ALJ amended that date to December 1, 2007. (R. 37, 133-34). Plaintiff had a previous application from 2003 that she did not appeal following denial from the ALJ in 2005. (R. 35-36). Plaintiff filed a second application in 2007 that was denied initially in Kansas. (R. 36). Plaintiff's attorney stated that the case was transferred to Oklahoma following the initial denial but that plaintiff had not received notice of the transfer. Id. This case originated when plaintiff filed a third application for benefits in September/October 2008. (R. 133-34). Plaintiff's last insured date under Title II was December 31, 2008. (R. 13, 78-79).

Plaintiff initially alleged that she was unable to work due to issues with her back, diabetes, fibromyalgia, depression, migraines, high blood pressure, knee pain, lack of oxygen, and issues with memory and concentration. (R. 149-57). Plaintiff's claims for benefits were denied initially on March 17, 2009, and on reconsideration on November 30, 2009. (R. 77, 78, 79-82, 85-88). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 89-90). The ALJ held a hearing on July 26, 2010. (R. 32-76). The ALJ issued a decision on August 12, 2010, denying benefits and finding plaintiff not disabled because she was able to

perform other work. (R. 8-23). The Appeals Council denied review, and plaintiff appealed. (R. 1-5).

**The ALJ's Decision**

The ALJ found that plaintiff was insured through December 31, 2008, and had performed no substantial gainful activity since December 1, 2007, the amended alleged disability onset date. (R. 13). The ALJ also found that plaintiff had severe impairments of "fibromyalgia, diabetes, morbid obesity, histrionic personality trait, and depression." Id. Her migraines were medically non-determinable. Id. Plaintiff's impairments did not meet or medically equal a listed impairment. (R. 13-14). The ALJ noted that fibromyalgia and obesity did not have their own listings and that plaintiff did not meet the requirements for the diabetes and depression listings.

The ALJ then reviewed plaintiff's testimony. (R. 15-16). Plaintiff testified that her issues with memory and concentration were the result of side effects from her medication. (R. 15). The ALJ stated that plaintiff appeared intoxicated. Id. Plaintiff also testified that her knees give out when she walks, that her fibromyalgia causes constant pain throughout her body, and that her back is also deteriorating. (R. 15-16). Plaintiff also complained of cramps in her hands. (R. 16). Medication for fibromyalgia caused allergic reactions that nearly killed her. Id. The pain medication that she does take fails to control the pain from fibromyalgia. Id.

The ALJ's review of the medical evidence was as follows: X-rays from May 1, 2008, "showed no significant abnormality" in plaintiff's lumbar spine. Id. In March 2008, plaintiff sought treatment for her right knee, which had "mild to moderate swelling and joint effusion." Id. Her pain level was low. Id.

Plaintiff received fibromyalgia treatment from Dr. Thomas Rose and his physician's assistant, Jack Bell. Id. Dr. Rose identified positive tender points in plaintiff's neck, upper back,

4

forearms, buttocks, and knees. Id. Mr. Bell completed a medical source statement in which he opined that plaintiff could stand and walk less than two hours a day and sit for just two or three hours a day. (R. 16-17). Mr. Bell also cited limitations on plaintiff's ability to reach, push, pull, grasp, handle, and finger. (R. 17).

Plaintiff made similar complaints to Dr. Ashley Gourd, who performed a physical consultative examination. (R. 16). Dr. Gourd believed that plaintiff's cane was not necessary because plaintiff walked with a stable gait at an appropriate speed without the cane. Id. Dr. Gourd also found that plaintiff had a normal range of motion, with the exception of "a slight (70 of a possible 90 degrees) reduction in back flexion." Id.

The ALJ also referred to plaintiff's psychological consultative examination with Dr. Minor Gordon. Id. According to the ALJ, Dr. Gordon noted "a slight slurring of speech," "significant immediate and short-term memory impairment," and "difficulty passing judgment in a work situation and communicating comfortably in a social situation." Id. He diagnosed plaintiff with mild to moderate depression and histrionic personality traits. Id. He also found that plaintiff was dependent on opioids and benzodiazepine. Id.

Based on this evidence, the ALJ concluded that plaintiff could perform sedentary work with additional limitations to "simple work under routine supervision and no direct contact with the public." (R. 15). The ALJ found that plaintiff's obesity was not "a significant impediment in her physical movements." (R. 17). He also found that plaintiff's complaints of cramping in her hands and legs were contradicted by the medical evidence, namely Dr. Gourd's consultative examination report. The ALJ found that he could not give "controlling or even significant weight" to Mr. Bell's opinions because Mr. Bell was a physician's assistant, not a doctor. Id. The

ALJ noted that Mr. Bell's opinion contained "no supportive evidence of his own for his conclusions and there is none available in any other of the file's records." (R. 17).

The ALJ also gave limited weight to Dr. Gordon's opinion, in light of plaintiff's "dramatic" and "hysterical" behavior. Id. The ALJ believed that plaintiff's presentation called into question the accuracy of plaintiff's mental limitations. Id. However, the ALJ also accepted all of Dr. Gordon's findings, including the finding that plaintiff was dependent on narcotic medications. Id. The ALJ stated that plaintiff's "dependence on narcotic based medications approaches the point of judging her drug use a material factor in the determination of her disability," but he made no further statements regarding plaintiff's lengthy list of prescription medications or the impact of her medications. Id.

The ALJ concluded that plaintiff's residual functional capacity prevented her from performing her past relevant work, but she could perform other work, such as an assembler, a miscellaneous laborer, and an inspector/checker. (R. 18). Accordingly, the ALJ found plaintiff not disabled. (R. 19).

**Plaintiff's Medical Records**

Plaintiff's medical records contain a number of items that the ALJ did not discuss. Plaintiff had MRIs on her spine in January 2006, which showed slight degenerative disc disease at L5-S1 with minimal herniation and slight degenerative changes at T6-7. (R. 204). The report notes that plaintiff's L5-S1 "probably is not particularly symptomatic." Id. X-rays taken in March 2006 after plaintiff sought emergency treatment for back pain were consistent with the MRI from January 2006, finding only slight degenerative changes in plaintiff's thoracic spine. (R. 298-99, 307).

Plaintiff continued to complain of back pain, however, so Dr. Rose referred plaintiff to Dr. Steen Mortensen, a rheumatologist, in June 2007. (R. 228-29). Dr. Mortenson sent a letter to Dr. Rose stating that "[c]learly Mrs. Zimmer has fibromyalgia as well as morbid obesity." (R. 229). No tender point testing is included in those records. (R. 228-29). Mr. Bell, the physician's assistant, also conducted his own fibromyalgia testing in June 2009. (R. 585). Plaintiff was positive at sixteen of eighteen tender points. Id.

In addition to back pain, plaintiff regularly complained of knee pain and was prone to falling. (R. 308-19). X-rays of plaintiff's right knee and lumbar spine in June 2006 were normal. (R. 319). Plaintiff had additional x-rays of her right knee in March 2008 when she sought emergency treatment for "local pain over the right knee" lasting for two days. (R. 415-18). Plaintiff had another fall in late August 2008 when she tripped over her cat and hit the sofa. (R. 466-69).

Plaintiff had additional MRI scans in September 2008. Plaintiff's left knee showed "a horizontal tear to the junction of the anterior horn with the mid body of the medial meniscus," with "probable grade 1 to grade 2 patellofemoral chondromalacia" and "mild to moderate knee joint effusion." (R. 548). Plaintiff's right knee showed "minimal central edge fraying of the mid body of the right lateral meniscus" but no tearing, possible "grade one to grade 2 later patellar facet chondromalacia," "grade 2 chondromalacia to the femoral trochlear groove," and "moderate to large knee joint effusion." (R. 549). Mr. Bell gave plaintiff knee braces to address her issues, but she complained that they increased her leg cramps. (R. 586).

Plaintiff's C-spine MRI was normal. (R. 550). However, plaintiff's T-spine MRI showed "disc protrusion at T9-T10" that was "mildly increased in size" in comparison to plaintiff's July 2006 MRI. (R. 550). Plaintiff's disc protrusion was "mildly indenting the spinal cord." Id.

Plaintiff's lumbar spine at L5-S1 was consistent with a May 2007 MRI, but plaintiff had developed an "uncovering of the disc and a broad based annular disc bulge" with a new "4mm central disc protrusion that abuts the thecal sac without compressing it." (R. 551-52). The abutment was not noticeable when plaintiff was lying supine. (R. 551).

To address plaintiff's pain, Mr. Bell recommended a number of pain medications. (R. 471-547, 584-600, 641-61). Attempts to treat plaintiff's fibromyalgia pain with the usual pain medications, such as Lyrica, were unsuccessful. (R. 51). Plaintiff testified at the ALJ hearing that she had allergic reactions to Lyrica and Myropex, and a third medication, Savella, was contraindicated with her other medications. Id. Plaintiff's inability to find a fibromyalgia medication is not clearly documented in the record, but her medication list does show that plaintiff tried a number of fibromyalgia medications beginning in January 2008. (R. 471-500, 586-600 641-61).

Plaintiff's medication list is extensive and troubling. For pain and anxiety/depression, plaintiff takes Oxycontin, Xanax, Lortab, Cymbalta, Zanaflex, Valium, Promethazine (an allergy medication with alternative uses to treat nausea and to take as a sedative or sleep aid), and Gabapentin. (R. 661). Plaintiff listed all of her medications, including dosages, shortly before the ALJ hearing. (R. 200). For example, plaintiff takes 80mg of Oxycontin twice a day and Xanax four times a day. Plaintiff noted that she had been taking most of the medications since 2002. Id. In April 2010, Mr. Bell wrote a note in which he stated that while plaintiff was taking "a lot of narcotics" with the potential for abuse and addiction, plaintiff was taking the medications as prescribed. (R. 642). Mr. Bell noted that he had talked to plaintiff many times about reducing her dosages, but he continued to prescribe high dosages and multiple medications. (R. 586-600, 642, 643-660, 675-79). He concluded that plaintiff's pain was controlled with her current medication

8

and that she would begin an exercise program soon. (R. 642). He recommended "detox if she ever gets off meds." Id.

The ALJ's review of the consultative physical and psychological examinations was sufficiently detailed. All other medical records are unrelated to plaintiff's disability application.

**The ALJ Hearing**

The ALJ held a hearing on July 26, 2010. (R. 32-76). The ALJ and plaintiff's attorney discussed plaintiff's previous application in 2003, which she did not appeal after the ALJ denied her claim, and the procedural history of her current case. (R. 35-36). Plaintiff's attorney amended the disability onset date to September 1, 2007 (the ALJ listed the onset date as December 1, 2007). (R. 37).

The ALJ commented several times that he believed plaintiff was intoxicated or otherwise under the influence. (R. 39, 41-42, 56-57). Another time, he implied that he did not think plaintiff was normal. (R. 58-59). Plaintiff was emotional throughout the hearing. (R. 48, 58).

Plaintiff testified that pain, depression, and issues with memory and concentration kept her from returning to work. (R. 42-44, 46-53). Plaintiff admitted that her medications affected her memory and concentration and kept her isolated, but she denied abusing her prescriptions. (R. 40, 42). Plaintiff explained that she was prone to falls, which increased the pain from her back issues and fibromyalgia. (R. 49).

Plaintiff testified that the pain from fibromyalgia caused her to lose her job as a forklift driver. (R. 43-44). Plaintiff tried to explain that her supervisor tried to accommodate her by decreasing her duties and recommending a doctor to her, but she did not communicate well with the ALJ. (R. 42-43, 60-64). The ALJ stated that he found plaintiff not credible due to the side

9

effects of her medication and the "whole relationship" between plaintiff's employer and her physician's assistant. (R. 70-71).

Plaintiff's attorney argued that the record demonstrated that plaintiff was following the instructions of her doctors. (R. 71-72). He stated that plaintiff could not afford surgery to repair her knees or her back. Id. Plaintiff's husband worked two jobs just to provide the health care plaintiff was receiving. (R. 72).

## ANALYSIS

Plaintiff raises two issues on appeal: First, plaintiff contends that the ALJ erred in analyzing the opinions of the physician's assistant who regularly treated plaintiff. Second, plaintiff argues that the ALJ failed to conduct a proper DAA analysis of plaintiff's prescription drug use. The Commissioner argues that the ALJ gave two reasons for rejecting the physician's assistant's opinion. The Commissioner also argues that the ALJ's DAA analysis, while not as detailed as it could be, is sufficient because the ALJ's reasoning is clear enough to allow for meaningful review. Because the first issue requires remand, the Court will not address the second issue.

**Physician's Assistant's Opinions**

The ALJ stated in his decision that he could not give "controlling or even significant weight" to Mr. Bell's opinion. (R. 17). The ALJ gave no weight to Mr. Bell's medical source opinion because "Mr. Bell gives no supportive evidence of his own for his conclusions and there is none available in any other of the file's records." Id. Plaintiff argues that the ALJ misapplied the law.

SSR 06-03p "clarifies how [the Commissioner] consider[s] opinions and other evidence from medical sources who are not 'acceptable medical sources." SSR 06-03p. The ruling states

that the factors set forth in 20 C.F.R. § 404.1527(c)(2)[2] to analyze medical source opinions "can be applied to opinion evidence from 'other sources'" because "[t]hese factors represent basic principles that apply to the consideration of all opinions from medical sources." SSR 06-03p. The ruling also states that "[n]ot every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." SSR 06-03p. Accordingly, the ALJ should consider the following factors: (1) the length and nature of the treatment relationship; (2) the evidence given by the other source that supports the opinion; (3) the consistency between the opinion of the other source and the record before the ALJ; (4) the other source's expertise or specialization, if any; and (5) other factors. See 20 C.F.R. § 404.1527(c)(1) – (6); SSR 06-03p.

Although an ALJ must consider the "other source" evidence, "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." SSR 06-03p. The ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p. The Tenth Circuit has applied this ruling as it is written, upholding ALJ findings where the reasoning is clear, even when the ALJ's analysis does not follow a step-by-step analysis of the factors or expressly state the weight given to the opinion of an "other source." See, e.g., Endriss v. Astrue, 2012 WL 6685446 (10th Cir. December 12, 2012) (holding that the ALJ "complied with our case law and SSR 06-03p by explaining the weight he assigned to [a chiropractor's] opinion and the reason for that weight" and, with respect to a physical therapist's

---

[2] At the time the Commissioner issued SSR 06-03p, the correct citation to the factors was 20 C.F.R. § 404.1527(d).

opinion, by giving a sufficient explanation to allow the Court to "follow the adjudicator's reasoning"); Keyes-Zachary v. Astrue, 695 F.3d 1156, 1164-65 (10th Cir. 2012) (finding "no harmful error" in an ALJ's decision not to give weight to "a nonacceptable medical source" when the Court could follow the ALJ's reasoning); Conger v. Astrue, 453 Fed.Appx. 821, 824-25 (10th Cir. 2011) (unpublished)[3] (holding that "[t]he ALJ did not expressly mention SSR 06-03p, or the factors articulated therein, but we do not require an explicit discussion of the factors in a decision") (citation omitted).

In this case, it appears that the ALJ misinterpreted the law. The regulations, SSR 06-03p, and the corresponding case law permit an other source's medical opinion, such as that of a physician's assistant, to carry significant weight.[4] See SSR 06-03p. The ruling provides that

> it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source: than to the opinion from a treating source does not conflict with the treating source rules. . . .

SSR 06-03p. The ALJ's blanket statement that he could not give significant weight to the physician's assistant's opinions misstates the rule.

The Court held a hearing on this matter to give the parties an opportunity to address this issue. (Dkt. # 22). The Commissioner argued that while the ALJ's decision was not artfully

---

[3] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

[4] The Court finds that the ALJ properly found that Mr. Bell's opinion could not be given controlling weight. See 20 C.F.R. §§ 404.1513 (stating that only an acceptable medical source can provide proof of a medically determinable impairment) and 404.1527(c)(2) (stating that a well-supported treating physician's opinion from an acceptable medical source is entitled to controlling weight). At the Court's hearing on July 24, 2013, plaintiff's counsel also agreed that the law would not permit Mr. Bell's opinion to have controlling weight, although she noted that Mr. Bell's opinion could outweigh a treating source opinion under SSR 06-03p. (Dkt. # 22, Hearing, Gayle Troutman).

drafted, his statement that he could not give significant weight to the physician's assistant's opinion related to the lack of evidence to support it and not to the legal standard regarding other medical source evidence. (Dkt. # 22, Hearing, Linda Green). Given the scant explanation that the ALJ provided for giving no weight to the medical source opinion that plaintiff could not do even sedentary work, it's not clear whether the ALJ was aware that Mr. Bell's opinion legally could be given significant weight, particularly in light of the MRI scans that the ALJ failed to mention. Although the ALJ stated that plaintiff's medical records did not support a finding of disability, the MRI scans indicate serious problems with plaintiff's back and knees. The ALJ failed to even rate those issues as severe impairments. Accordingly, the Court simply cannot determine whether the ALJ applied the correct legal standard.

## CONCLUSION

The ALJ misstated the legal standard for evaluating other medical source opinion evidence; therefore, the case must be remanded for further proceedings. On remand, the ALJ should clarify his reasons for making the statement that Mr. Bell's opinion could not be given "even significant weight." If the ALJ intended his statement to mean that Mr. Bell's opinion was not supported by the evidence, he should articulate clearly his reasons for that finding. If the ALJ misinterpreted the rule, then he should re-evaluate Mr. Bell's opinion.

Because the Court finds that remand on this issue is proper, the Court finds that it need not address the second issue raised by plaintiff: whether the ALJ conducted a proper DA&A analysis.

SO ORDERED this 8th day of August, 2013.

T. Lane Wilson
United States Magistrate Judge